```
 1                   UNITED STATES DISTRICT COURT
                       DISTRICT OF MASSACHUSETTS
 2


 3


 4     United States of America,    )
                     Plaintiff,     )
 5                                  )
                                    )
 6     vs.                          )    Case No. 23-mj-08004-PGL-1
                                    )
 7                                  )
       Yaneliz Lizbeth Lara,        )
 8                   Defendant.     )


 9


10     BEFORE:  The Honorable Magistrate Judge Paul G. Levenson


11


12                        Initial Appearance


13


14


15                           United States District Court
                             1 Courthouse Way
16                           Boston, Massachusetts
                             January 27, 2023
17


18


19


20


21


22
                         Marianne Kusa-Ryll, RDR, CRR
23                        Official Court Reporter
                         United States District Court
24                        595 Main Street, Room 514A
                           Worcester, MA 01608-2093
25                     508-929-3399 justicehill@aol.com
                      Mechanical Steno - Transcript by Computer
```

1    APPEARANCES:

2    United States Attorney's Office
     John T. McNeil, Assistant United States Attorney
3    John Joseph Moakley United States Courthouse
     1 Courthouse Way, Suite 9200
4    Boston, Massachusetts 02210
     on behalf of the Government

5
     Federal Public Defender Office
6    Sandra M. Gant, Assistant Federal Public Defender
     District of Massachusetts
7    51 Sleeper Street, 5th Floor
     Boston, Massachusetts  02210
8    on behalf of the Defendant

9    Also present:

10   Kaileen Paiva, U.S. Probation Officer

11

12

13

14

15

16
                 Proceedings recorded by sound recording
17          and produced by computer-aided stenography

18

19

20

21

22

23

24

25

1                    P R O C E E D I N G S

2              The following proceedings were held in open court

3    before the Honorable Paul G. Levenson, United States Magistrate

4    Judge, United States District Court, District of Massachusetts,

5    at the John Joseph Moakley U.S. Courthouse, 1 Courthouse Way,

6    Boston, Massachusetts, on January 27, 2023.)

7              (At 11:57:20 a.m., the recording begins.)

8              THE CLERK:  -- court for the District of Massachusetts

9    is now in session, the Honorable Paul G. Levenson presiding.

10             You may be seated.

11             Today is January 27th, 2023, United States versus

12   Yaneliz Lizbeth Lara, Docket No. 23-mj-8004.

13             Counsel, please identify yourself for the record.

14             MR. McNEIL:  Good morning, your Honor.  John McNeil

15   for the United States.

16             THE COURT:  Good morning, Mr. McNeil.

17             MS. GANT:  Good morning, your Honor.  Sandra Gant with

18   the Federal Defenders on behalf of Yaneliz Lara.

19             THE COURT:  Good morning.  I notice that Ms. Lara is

20   in the court here with us.

21             Give me one moment here.

22             (Pause.)

23             THE COURT:  So we're here for an initial appearance.

24             Ms. Lara, can you please stand.

25             I'm Magistrate Judge Paul Levenson, and this hearing

1     is your initial appearance before this court.  I'm the

2     magistrate judge assigned to your case, and this is not a

3     trial.  You're not going to be asked to answer the questions at

4     this time, but I will tell you about the charge against you --

5     charges, and I'll tell you about some of your rights, including

6     important constitutional rights, such as your right to be

7     represented by an attorney.

8              And then I'll consider release or detention and

9     what -- what's going to be the set of rules or conditions that

10    may apply as your case goes forward, and we'll set a date for

11    the next hearing in your case.

12             So let me start with the right to counsel.  You have

13    the right under our Constitution to be represented by counsel,

14    that is by a lawyer, and that applies at all stages of the

15    proceeding, in and out of court, including during this hearing.

16             You're entitled to a reasonable opportunity to confer

17    with your lawyer, which if you need to stop or ask for

18    something, we will give you that opportunity.  And your lawyer

19    can be present during any questioning by authorities.

20             Now, you have a right to hire a lawyer of your own

21    choosing; and if you cannot afford to hire a lawyer, the Court

22    will appoint one for you without cost.

23             So do you understand your right to an attorney?

24             THE DEFENDANT:  Yes.

25             THE COURT:  Okay.  And I have in front of me a

1     financial affidavit.

2               Did you sign this document?

3               THE DEFENDANT:  Yes.

4               THE COURT:  Okay.  It's a digital signature, but

5     you've reviewed this, and is the information on this document

6     true to the best of your knowledge and ability?

7               THE DEFENDANT:  Yes.

8               THE COURT:  Okay.  So -- one moment.  Ms. Grant, can I

9     speak to you --

10              MS. GANT:  Yes.

11              THE COURT:  -- briefly at sidebar?

12              (Sidebar as follows:)

13              THE COURT:  There's a -- it looks like a *Brady* update

14    that I can give -- (indiscernible).

15              MS. GANT:  No, that's right.

16              THE COURT:  Okay.  What's your feeling on whether she

17    should be making some contribution towards (indiscernible)

18    these?

19              MS. GANT:  At this point where she's not working and

20    where that money is essentially either sitting and being

21    depleted on that, this is a current amount.  I expect it to be

22    depleted as the months go on.  So I don't know if a

23    contribution, especially where she's not working and she's a

24    senior in college I just don't (indiscernible) to her.

25              THE COURT:  Right.  And these are somewhat

1    (indiscernible)?

2              MS. GANT:  Right.  Right.

3              THE COURT:  All right.  Thank you.

4              (End of sidebar.)

5              THE COURT:  So I've had a chance to review your

6    financial affidavit and did discuss it briefly with Attorney

7    Gant, and I am going to go ahead.  I find that you cannot

8    afford an attorney, and I'm going to go ahead and appoint

9    Ms. Gant as your lawyer.

10             Now, another right you have under the United States

11   Constitution is the right to remain silent.  That means you

12   don't have to say anything to anyone about the charges

13   set forth in the complaint here.  You're not required to make

14   any statement.  If you have made a statement, you're not

15   required to say any more.

16             If you start to make a statement, you may stop at any

17   time, and you need to know that anything you say can be used

18   against you in a court of law.

19             So, now, the government has filed a complaint here,

20   and it charges you with two offenses.  It charges you with

21   making bomb threats in violation of Title 18 United States Code

22   Section 844(c) and with making interstate threats in violation

23   of Title 18 United States Code Section 875(c).

24             Mr. McNeil, what are the maximum potential penalties

25   for these offenses?

1          MR. McNEIL:  Just to clarify, your Honor, because I

2     think you misspoke --

3          THE COURT:  Oh.

4          MR. McNEIL:  -- a moment ago.  The first charge is

5     844(e) rather than (c).

6          THE COURT:  Oh, I think there may be a typo in your

7     JS-45 then.

8          MR. McNEIL:  Oh, in my JS-45.  Okay.  I was looking at

9     the face of the complaint.

10          THE COURT:  Okay.

11          MR. McNEIL:  My error then.  The maximum penalty in

12     the first charge --

13          THE COURT:  Well, it doesn't matter whose error it is,

14     but thank you for the correction.

15          MR. McNEIL:  The maximum penalty for the first charge

16     844(e) is ten years in prison, a $250,000 fine, three years of

17     supervised release, and a $100 special assessment.

18          The maximum penalty for the 875(c) charge is five

19     years in prison, a $250,000 fine, three years of supervised

20     release and, of course, that $100 special assessment.

21          THE COURT:  Okay.  Thank you.

22          So I think the next thing we're going to need to

23     do is talk about possible release or detention, and for

24     that I think, Ms. Lara, if you want to sit down, because this

25     will take a little bit of time to work through what our options

1    are.

2            Mr. McNeil, I see that you have moved for detention

3    and that at least the email copy I received shows a fairly

4    nuanced take on the situation.  We have a very young woman,

5    who's charged with very serious offenses, but we also have good

6    reason to be concerned about her welfare here.

7            So what is the government's position?

8            Does it make sense for me to hear first from the

9    government or from the defendant?  I've seen the report of

10   the --

11           MR. McNEIL:  I think it makes sense first to hear from

12   me, your Honor, because I'd like to proffer some additional

13   facts.

14           THE COURT:  Okay.

15           MR. McNEIL:  Because we -- we're not relying just on

16   the facts in the affidavit in this case.

17           THE COURT:  Okay.

18           MR. McNEIL:  Although, overwhelmingly, the most

19   important facts are those found in the affidavit.

20           The -- the defendant did consent to have her mobile

21   telephone searched, and we have started that process, but as

22   you probably know, that process can take a very long time,

23   particularly because there's a great deal of data.

24           And so our -- our -- our -- our reasons for searching

25   the phone, of course, are to make sure that she is, in fact,

1    the perpetrator of this crime, which we, in fact, confirmed on

2    the phone, but -- but also to get a sense about to the extent

3    to which she posed a danger to the community or to herself, and

4    to understand this apparent disconnect of a very young woman

5    with no criminal history saying the kinds of threats that she

6    has said to her now former employer.

7         So in that search, which I -- which I've -- and I've

8    shared this all with defense, with Pretrial as well.  We found

9    a few things that were relevant.

10        The first is that on or about December 8th through

11   December 10th, all right, so this is just -- the threats

12   started on the 8th of December and -- sorry -- the threats

13   started on the 4th of December and went through the 8th of

14   December.  So this started on the last day of the threats.

15        She visited Ted Kaczynski's Wikipedia page and also

16   looked at a book about him online at Barnes & Noble.  There are

17   additional web history results about the Unabomber and

18   Ted Kaczynski, although some of those have no dates.  So she

19   apparently was doing some kind of research around the time of

20   these threats into a very -- maybe the most infamous bomber in

21   the United States.

22        She also viewed a website regarding whether someone

23   can own a BB gun, and that was on about December 6th, 2022.

24        And among the web results from the extraction were

25   multiple searches for a gun range and legality of licenses or

1    IDs needed to go to a gun range.  There were no dates at least

2    on the Cellebrite analysis that showed exactly when she made

3    searches for these gun range visits or legality of that, and

4    there was a Justinia -- Justinia -- Justina or Justinia (sic)

5    law article regarding committing federal crime and also being

6    charged.

7        It's -- it's apparent from a phone that she used a

8    number of different pseudonyms to communicate with various

9    groups, and one of the -- one of the communications that was

10   found was one that had to do with -- it was titled Feeling

11   Increasing Hostile and Angry.  And it said as follows, the

12   caption, Is anyone else -- it says, Is anyone else feeling more

13   and most hostile and angry the longer they grieve?  My sister

14   passed away last month, and I've been struggling to find the

15   right outlet to release my anger.  Part of my anger is from

16   feeling humiliated about having to send my sister's obituary to

17   corporate in order to get three days of bereavement leave,

18   three effing days.

19       So, in any event, that -- I think that does reflect --

20   it's sort of an admission to the -- to the crime and the use of

21   online to share some of her -- her thoughts.

22       So those were the initial results that we got back.

23   And then I received additional communications about another

24   pseudonym.  And we don't have a date on this, your Honor, but

25   most of the -- she had a pseudonym that was called Trump Fan

1    8321, which was associated with her phone.  And it was an

2    Instagram account that is no longer active, but it was most

3    recently -- it was most recently used between July and December

4    of 2022.  There are multiple instances of hateful rhetoric in

5    this sent by her under the pseudonym to include racial slurs.

6         In addition, there are multiple instances of the owner

7    sending messages threatening the recipient with various forms

8    of violence, and I have been told by the agent that those

9    threats included that she was going to bash your skull in with

10   a pipe and that he was going to, quote, rape you with a rod.

11        So -- so, factually, that -- with -- there's one other

12   fact I would like to proffer, your Honor.  I asked, and the

13   Pretrial Services officer can confirm this.  I asked the

14   pretrial -- counsel gave the Pretrial Service Office the

15   opportunity to consult with the current therapist for the

16   defendant, which I think makes a lot of sense.  It was great.

17        And in the Pretrial Services report, it says that

18   there's reference to her participating in weekly therapy, and

19   then it says, When the Probation officer contacted the

20   clinician, she -- that is the probation -- the clinician

21   reported that she does not believe the defendant is a risk of

22   danger to herself or others at this time.

23        So I asked the Pretrial Services officer, well, did

24   this clinician know one of the current charges to -- even if

25   she knew of the charges, did she know about the specific

1    threats; and three, did she know anything about these

2    additional social media comments and threats, and I think the

3    answer was not -- that she did not know or she did not believe

4    that the clinician did know that.

5         And it may be Ms. Gant knows the answer to that, but I

6    think that in rendering this statement that she's no danger,

7    and I'm not sure that was an informed opinion by the clinician,

8    and I -- and absent more, I don't think the Court should rely

9    upon her.

10        THE COURT:  Okay.

11        MR. McNEIL:  So that's with regard to factual proffer.

12   And I'll be heard in argument if you want to hear me now.

13        THE COURT:  Yeah, I think let's start by -- I have the

14   sense that there's more Ms. Grant may be able to add to the

15   factual picture, and then let's try sorting out after that.  So

16   let me hear from Ms. Gant.  If you guys don't mind working in

17   series, it's helpful for me to get the information out and then

18   work with you to sort through what we make of it.

19        MS. GANT:  I think that makes sense.  It also helps me

20   not to have to remember everything that I would like to say all

21   at once.

22        I'm going to take Mr. McNeil's last point and then

23   I'll kind of backtrack.  After Ms. Lara was, I think -- I think

24   after the interview by agents is when she first went to

25   therapy.  Is that right?

1          THE DEFENDANT:  Uh-huh.

2          MS. GANT:  She started engage -- reengaging in therapy

3    at the same practice that she had previously been treated by a

4    clinician in 2020.  She engaged in therapy again starting

5    December 23rd, and she has been going weekly.

6          Her therapist does know about the charges.  I doubt

7    she knows about the disclosures that were just made by

8    Mr. McNeil, because we just learned about them this morning

9    and last night, but I do think it's an informed opinion, and

10   it's one who has not only a history with Ms. Lara both in terms

11   of a record history of the moving-forward counseling, which is

12   the clinical practice, but also in -- in seeing her most

13   recently.

14         To put this into context, we're dealing with a family

15   who has experienced an enormous tragic loss.  On November 8th

16   of 2022, Ms. Lara's 17-year-old sister committed suicide, and

17   it was profoundly impactful and world-altering for the family.

18         Now, grief, I think, manifests in many different ways.

19   To say that this is just a manifestation of grief, I think, is

20   an oversimplification, but it cannot be divorced from the

21   grief.  I think what we're dealing with here is an unfortunate

22   combination of factors.

23         The first and most obvious one is, frankly, one that

24   is foreign to me not having grown up in a generation that's

25   connected to the phones, the internet, and the kind of idea of

1    anonymous engagement in the internet.  But we're also dealing

2    with somebody who does have an admitted history of depression,

3    and the family's world was, frankly, completely rocked.

4         Ms. Lara and her younger sister were close.  They

5    shared a room.  There's just no other way to say that this was

6    an enormously profound and tragic loss.  And without the kind

7    of coping skills and the ability to cope with it by herself,

8    she lashed out, and I don't know that the proof is necessarily

9    just found in the phone, because she willingly submitted to an

10   interview with agents where she confessed to the crime.  And

11   just to put into context, I know the Court has read the

12   affidavit.  Ms. Lara initially denied the crime.  The very next

13   day, her family contacted the agents, invited them back into

14   the home; they came to the home, and she fully confessed.

15        And I think by the agent's own account she presents as

16   kind of a mystery, because the truth is she's meek and

17   well-mannered and a kind person.  And it's -- there's a

18   disconnect for sure between that and the posting that either

19   predated or postdated her sister's passing.  But I think what

20   we're dealing here with is with somebody who should not be

21   detained.  And I'll get to the argument after Mr. McNeil kind

22   of lays that out.  But at least on a factual basis she is

23   currently engaged in treatment.  Her mother is here in the

24   courtroom.  They live in a small apartment in Salem.  It is a

25   close family.  It is a family, I think, that, you know, there's

1   the old adage of sunlight being the best disinfectant, but what

2   we're dealing with here is a -- a problem that has been exposed

3   both in terms of how Ms. Lara was poorly coping with her

4   sister's death and poorly coping with her own depression.

5          Having seen the therapist since December 23rd, she now

6   has an appointment that was scheduled even before today to see

7   a prescribing nurse practitioner for psychiatric medication.

8   She was previously on a course of Zoloft in 2020 and

9   discontinued that on her own.  And I think what we really need

10  to be thinking about are what are the resources that would best

11  be able to support her.  As the -- as the Court has seen in the

12  Pretrial Services interview, she's in her -- from the report

13  she's in her last year of college studying public health.  It

14  is very difficult for a young woman who experienced a loss to

15  kind of see a life ahead of herself, and the prospect of being

16  federally charged after having never been in trouble before at

17  all is also life-altering.

18         But the way she has handled herself is, frankly,

19  commendable.  From meeting with agents, inviting them back into

20  her home, confessing to them with her mother and her priest

21  present, which also I think demonstrates familial and community

22  support, but also volunteering her phone.  I don't know that

23  the agents needed to even seek a warrant for it.  A request was

24  made, and she turned it over.

25         And I think it's also telling -- of course, the

1  government hadn't had the extraction materials from the phone

2  when they issued the summons, but with the summons, I asked

3  Mr. McNeil to pass along my direct phone number, because I knew

4  that the Defenders would likely be appointed given what limited

5  information we knew at that time.

6          Within two minutes of the agent having left the

7  summons, Ms. Yaneliz Lara called me immediately.  We have met,

8  I think -- we've spoken every day since she has -- since she

9  received the summons last Thursday.  Not yesterday, but the

10  week before.  And we have met, I think, three or four times

11  since then.

12          This is somebody who really takes not just the

13  allegations seriously, but is forward-thinking, because I

14  think the biggest concern on her mind and her family's mind

15  is not just how is she going to take care of herself in the

16  immediate future, but how is this going to affect the rest

17  of her life.  And I think that goes not just to her state of

18  mind but also to a positive forward-thinking mindset of

19  somebody who is determined to kind of make it through this in

20  one piece.

21          As a senior in college, she does attend online

22  classes, and she is not working obviously at AdviniaCare, but

23  one thing I would note, and I think the Court can take this and

24  give it whatever weight, but it's my understanding that what

25  precipitated the alleged threat that formed the basis of these

1     charges -- I mean, it's just really one threat kind of

2     regurgitated and copied and pasted.  And that doesn't make it

3     any better, but it certainly --

4          THE COURT:  Understood.

5          MS. GANT:  It -- there was no action taken, although

6     there were these concerning internet inquiries.  No evidence

7     that she has ever gone to a gun range, ever possessed a weapon,

8     ever engaged in any violent act.  And she had a very good

9     relationship.  She was an activities aide with this elderly

10    community facility.  She had a very good relationship with the

11    patients there and with other staff, and I think they, too,

12    were surprised by -- by Ms. Lara being identified as the

13    culprit behind the threats.  And I think the Court can infer

14    one of two things from that.

15         The first is that at that moment when she was grieving

16    her sister's death and when she was either in internet chat

17    rooms or on Google with Wikipedia or sending these threats, she

18    was doing it alone kind of under the cover of the darkness of

19    her grief.  And that cover of darkness has been fully exposed.

20    Not only is she exposed in this courtroom, her family is well

21    aware now of the conduct and of the concerning nature of the

22    communications.

23         Nobody is more concerned and willing to engage

24    Ms. Lara in treatment than Ms. Lara herself and her mother,

25    Ironelis Diaz, who's present in the courtroom.  And so I think

1    again sunlight being shown and kind of uncovering the darkness

2    of grief that she has been living in is a hugely factual

3    consideration and a timeline consideration that should be

4    considered as we discuss detention later.

5           And I do think that at this point any time somebody

6    presents to the Court with no record of criminal arrest,

7    convictions, history of violence or anything like this, and the

8    contents of their mind or the contents of the moment of their

9    mind are exposed, it's deeply humiliating.  I mean -- and --

10   and the fact that humiliation is the first instinct here, I

11   think shows that she knows better and shows that she knows

12   right from wrong, and I think but for what has been a

13   long-standing battle with depression that is now being treated

14   and but for the tragic loss of her sister, I don't think this

15   Court would have ever seen Yaneliz Lara.  And that is a

16   tragedy.

17          I will address the issues specific to detention.

18   I'm -- I'm in agreement with Probation, save one issue, but I'm

19   happy to address that in a moment, unless the Court has

20   specific factual questions.

21          THE COURT:  No, no, this is helpful.

22          So I'm going to give both counsel an opportunity to

23   respond to some thoughts that I garnered really from the

24   Probation report.

25          First concerns -- well, there's a range of various

1    area of concerns here.  There's a very young person who has for

2    all appearances done some very harmful things.  Ms. Gant, I

3    hear you that it may well be that there's a generational aspect

4    of this where some kinds of online behavior are normalized and

5    are taken as simply acting out and people lose sight of the

6    fact that whether it's on Insto or TikTok or by an

7    old-fashioned rotary phone, making threats across state lines

8    is a federal crime and for good reason.

9         You know, there -- it's -- it would appear that that

10   may be a piece of this.  It also is evident that real harm and

11   risk to the public is at stake.  I mean, the impact of bomb

12   threats on any operating organization, let alone one where

13   they're caring for parent -- for patients and people in need is

14   huge.  We're living in a time where people are for good reason,

15   sadly for good reason, in fear of their personal safety in ways

16   that were much less common even four years ago.  And so the

17   power and harm of -- of threats is magnified even at a time

18   when the ease of making threats and the anonymity and even the

19   normalization of threat behavior is rampant on the internet.

20   So it's a -- it's a -- it's a sad confluence of factors there.

21        So I'm -- I am mindful that, as I understand the

22   government's position in this, and this is mostly not for the

23   Court to be directly involved in, but will be, I'm sure, the

24   subject of discussions between Mr. McNeil and Ms. Gant, and I

25   will just say it makes sense to me that one of the goals one

1    hope can be accommodated in this is not to deright -- derail

2    another young life but to allow somebody to go forward with

3    life and get something back onto a track that was clearly aimed

4    towards caring for others and caring for herself.  And it does

5    look to me like people all around from government, defense and

6    Probation pretrial services are rightly focused on not only the

7    harms from these alleged crimes, but also on how to avoid --

8    I'm looking for a word -- how to avoid harm to another life

9    that is young and where in some respects at least we've got

10   behavior that does appear to be borne out of what may have been

11   a grief reaction, may have been preexisting depression, may

12   have been failure of constraints and social isolation and

13   social media.

14          Certainly I'm not going to pretend from the vantage

15   point of having read a few pieces of paper to answer the

16   question of what it is.  I'm simply posing what I see as the

17   ingredients here.

18          One of the concerns that Probation has raised that

19   strikes me as a serious one is that if part of what we're

20   concerned about, and the legal -- I guess let me start with the

21   legal framework is that the government, of course, bears

22   the -- the ultimate burden of proof in this case.  Is this even

23   a case in which detention is available on -- I guess it's a

24   risk of threat.  So yes, it is a case in which danger to the

25   community is one of the available factors.

1         MR. McNEIL:  It is, and I should have made clear

2    earlier because we're doing this (indiscernible) --

3         THE COURT:  Yeah, I know.

4         MR. McNEIL:  -- the government is moving for detention

5    under --

6         THE COURT:  Yes.

7         MR. McNEIL:  -- 3142(f)(1), your Honor, and this is a

8    kind of crime that's under that.

9         THE COURT:  Got it.  It makes sense.  Okay.  So as a

10   practical matter though, it's also a case, and I think I will

11   want to hear, if possible, some more about family support and

12   family arrangements here.  And I gather if Ms. Lara's mother is

13   available to discuss that, I think that may be relevant, but

14   first let me frame the issue.

15        Ms. Gant, yes.

16        MS. GANT:  Yes.  I just wanted to say one thing that I

17   had forgotten to say about the therapy in which she's engaged

18   currently.  The therapist is a mandated reporter, so if there

19   was a risk to self or others that were visible during the

20   multiple counseling sessions she's had, she would have been

21   required to call 9-1-1.  And so I just wanted to add that.

22        THE COURT:  Right.

23        MS. GANT:  And I think at least, I think Probation

24   might also -- probation officers might be mandated reporters,

25   too.  I'm not sure.  Maybe.

1           THE COURT:  Yeah.

2           MS. GANT:  But I just wanted to -- to add that as a

3      fact.

4           THE COURT:  No, I understand that.  I'm not inclined

5      to defer altogether the responsibility of the Court in terms of

6      weighing the conditions that would assure the safety of the

7      community simply deferring them to --

8           MS. GANT:  Yes.

9           THE COURT:  -- others' obligations but --

10          MS. GANT:  Okay.

11          THE COURT:  -- I appreciate the point, Ms. Gant.

12          One of the things that the Probation report raises is

13     whether imposition of, for example, I mean -- well, let me just

14     start by thinking out loud.  And I'm not -- I am not making a

15     ruling here.  I'm offering preliminary thoughts for the input

16     of counsel and Probation.

17          My concern is that detention strikes me as having the

18     potential to be extremely destructive for the defendant.  If

19     it's necessary for the safety of the community, so be it, but

20     that, you know, the obligation the Court is to find the least

21     restrictive set of conditions that will reasonably assure court

22     appearance and safety of the community.

23          I do take from having read in the affidavit about the

24     decision to consult with a -- with a family priest and to call

25     the FBI and to make a confession to be a sign of taking

1    responsibility and personal ownership of what again on the face

2    appear to be -- I'm hesitate to use the word horrific mistakes.

3    For Ms. Lara, they may have been horrific mistakes.  For the

4    people who received the threats, there's a reason these things

5    aren't just mistakes, they're crimes.  But in sorting that out,

6    I have a very strong preference, if we can avoid detention, to

7    do so, which then leads to the question of does home detention

8    make sense in this context, and the concerns that the Probation

9    department has raised are:  One, is it -- is it necessary; two,

10   does it add, do conditions of home detention improve the

11   situation in terms of public safety in a material way.  In

12   other words, if what we're worried about is impulsive or

13   potentially self-destructive behavior does home detention help

14   with that, and I think there's some question on that ground and

15   at least in my mind as to what benefit formal home detention as

16   opposed to strict conditions might -- might supply.

17           So that's one of the things I'm thinking about is what

18   makes sense in that regard, and I am concerned to have

19   a -- Ms. Gant, I'm not necessarily looking for a response to

20   this now.  I just want to let both --

21           MS. GANT:  Sure.

22           THE COURT:  -- sides know.  I think this is a -- I

23   mean, this is a heartbreaking situation as well as being a

24   serious crime, and I'm trying to sort through what makes sense

25   within the context of, first, the legal obligations in terms of

1    protecting the public, but also taking care of people who may

2    be vulnerable who are in our system.

3    Given that only a modest amount of time has passed

4    since the events in question and that the events do bespeak

5    genuine harms to the community, a clinician saying that how

6    somebody is presenting in a clinical setting persuades them

7    that there's no risk to the public when in some respects the

8    risk to the public is evident from recent past actions, that's

9    the part that I'm finding hard to sort out, and I'm -- I think

10   it makes sense to -- to consider whether a separate, if you

11   will, more forensic evaluation of Ms. Lara's mental condition

12   may be useful.

13   One of the things that I have often heard and I find

14   believable is that for somebody to make progress with therapy,

15   there needs to be what sometimes is called a therapeutic

16   alliance, a connection with a clinician, a clinician who may at

17   times have good reason to be gentle or nonconfrontative about

18   behaviors that are, in fact, very frightening or dangerous.  So

19   it does strike me that asking a clinician to report to the

20   Court can undermine the relationship between the clinician and

21   the patient.  The patient needs to be in a situation where as

22   much as possible, and Ms. Gant has referred to this.  I mean,

23   Ms. Lara's facing right now I'm sure this is a terrible day in

24   your life.  Nobody sets out to find themselves in federal court

25   facing serious charges.  Nobody sets out to have these aspects

1    of their behavior revealed and discussed publicly, and that's

2    just tremendously hard.  I can tell you --

3           (Phone ringing.)

4           MS. GANT:  Oh, I'm so sorry.  That's my mother.  I'm

5    so sorry.  I have her on a -- on a pass-through.  That's my

6    mother.  I'm so sorry.

7           THE COURT:  Okay.

8           MS. GANT:  I'll turn my phone off.  I'm so sorry.

9           THE COURT:  Judge Woodlock would now own your

10   telephone --

11          MS. GANT:  Yes, I'm so sorry, your Honor.

12          THE COURT:  -- you realize?

13          MS. GANT:  I'm so sorry.  I blame my mother.  I'm so

14   sorry.

15          THE COURT:  All right.  I'll blame your mother, too,

16   this time.

17          But the -- the point I'm making that I think is a

18   serious one is, Ms. Lara, you're in -- this is terrible right

19   now, and it's not going to be great in the very near term,

20   because you've got a lot to work through, but you have from all

21   I can read, you've got family support, you've got clinical

22   help, you have a lawyer who's well known to me as somebody who

23   really cares about and dedicates her efforts to help her

24   clients, not just facing criminal charges, but thinking about

25   how those charges affect their lives.  So you've got some very

1    fortunate supports.

2         You also have, you know -- you've made it to the

3    senior year of college through COVID, which is one of the most

4    isolating ways anybody can go through education.  So there are

5    a number of positives.  And Ms. Gant tells me you are looking

6    at the future, which is indeed where you need to look, and I'm

7    very glad to hear that description of where you are now.  This

8    is something that -- there's nothing you're going to enjoy

9    about the experience in federal court, but you will get through

10   it, and you will move on to have a life, and that is absolutely

11   critical, and that is part of what I'm thinking about in terms

12   of just trying to consider what are we doing here today and

13   what decisions we make.

14        I guess I am concerned that we -- that the behavior

15   here is really hard to understand, is probably rooted in a mix

16   of things, grief, terrible tragedy within a family, boundary

17   issues relating to the internet that are not uncommon, but may

18   be extreme here, rage or anger that may be having trouble

19   finding direction or outlet.

20        All of these things are complicated, and I think it

21   probably makes sense instead of saying, well, you're going to

22   be talking to a therapist who will try and help you, but

23   they're also going to be talking to the Court which makes it

24   very hard to build that relationship if -- if when talking to

25   somebody about what you're thinking or feeling you're worried

1    that it's also going to get reported to the Court.

2         So I think an independent evaluation to me is

3    essential to separate out the forensic assessment of, okay,

4    what can we know, what can we discern right now about where

5    this conduct and where these things that are -- are showing up

6    in past evidence of past communications, where is that fitting

7    for Ms. Lara now in terms of safety of the community.  So I

8    think that's going to be an important piece of it.

9         Ms. Gant, I'm not certain -- well, I'm not sure how

10   well it works unless the defendant can agree to an independent

11   evaluation, but that would to me be a very important ingredient

12   in any plan for release here.

13        MS. GANT:  So I do have some thoughts, and initially I

14   told the government and Probation that I thought it would make

15   sense for her current therapist, but I actually didn't think

16   what your Honor just said in terms of preserving the

17   therapeutic relationship and ensuring that that's a kind of

18   safer space where she knows --

19        THE COURT:  She needs a place she can speak without

20   thinking it's going --

21        MS. GANT:  That point is --

22        THE COURT:  -- straight to me and Mr. McNeil.

23        MS. GANT:  Yeah, that point is very well taken.  To

24   the -- to the question of an independent mental health

25   evaluation, Mr. McNeil at the very outset informed me that the

1    reason he requested a summons was in large part due to

2    perceived mental health issues --

3            THE COURT:  Yeah.

4            MS. GANT:  -- and that is not unnoticed and we are

5    not -- (indiscernible) --

6            THE COURT:  Oh, no --

7            MS. GANT:  Yes.

8            THE COURT:  -- everything I've seen here is suggestive

9    to me that you have a prosecutor who is acutely aware of both

10   his duty to protect the public from criminal activity and of

11   the fact that we have a vulnerable and fragile person here, and

12   the goal of our system is to protect the public, not to break

13   people or ruin their lives if we can.

14           MS. GANT:  And I think what your Honor said -- I think

15   perhaps the word that your Honor was looking for was an attempt

16   to not retraumatize her.  And consistently discussing trauma

17   with multiple different people is retraumatizing, but it's at

18   times, I think, unavoidable.  And so after speaking with

19   Mr. McNeil, after speaking multiple times with the family and

20   with Ms. Lara, I've contacted and am retaining a clinical

21   forensic psychologist, who specializes both in emerging adults,

22   which Ms. Lara is, and who specializes in trauma-informed care.

23   And I think that's critically important to be able to not just

24   determine how best to get to the root of the problem and to

25   understand the root of the problem, but also to afford Ms. Lara

1    a safe space, separate and apart from the therapy that she's

2    engaged in.

3            THE COURT:  Okay.

4            MS. GANT:  And so that is something that I will be

5    doing kind of independent, even if the Court were to --

6            THE COURT:  Now, where does that fit with -- I mean,

7    frankly, I'm also interested in a report.  My concern is that

8    the conduct here is troubling enough, prolonged enough,

9    sustained enough that I'm not comfortable on -- well, I have no

10   qualifications.  I read papers just like any other lawyer.  I

11   hear about these things, but I don't have independent expertise

12   in this.  My concern is to assess danger to the public --

13           MS. GANT:  So I think --

14           THE COURT:  -- as well as to -- as well as risk of

15   self-harm, and that is something I would want to see a report

16   on, and that might be different from what you're describing.

17   I'm not sure.

18           MS. GANT:  It's, I think, going to be a mix of both.

19   I mean, I intend -- I intend the doctor to conduct a

20   comprehensive psychological evaluation --

21           THE COURT:  Uh-huh.

22           MS. GANT:  -- and review a number of records,

23   interview family members, collaterals, potentially even former

24   co-workers.

25           THE COURT:  Uh-huh.

1          MS. GANT:  That process, I think, will take a long

2     time in order to produce --

3          THE COURT:  Yes.

4          MS. GANT:  -- a comprehensive evaluation.

5          And I've been up front with Mr. McNeil.  I certainly

6     think it would be helpful for the government to read it at some

7     point, if and when we get to the point of disposition.

8          THE COURT:  Right.

9          MS. GANT:  But in terms of producing a report that

10    addresses a kind of narrower set of factors --

11         THE COURT:  Uh-huh.

12         MS. GANT:  -- I would like to use the same doctor to

13    be able to produce a narrower kind of abbreviated report for

14    the Court's review to address what your Honor just said both in

15    terms of appropriate treatment and recommendations for clinical

16    recommendations for treatment and care, and an assessment of

17    current and future risk.

18         THE COURT:  Okay.

19         MS. GANT:  And so I think to avoid having Ms. Lara be

20    exposed to multiple evaluations --

21         THE COURT:  Right, your take is if we can do it with

22    two, rather than three points of contact, you'd like to explore

23    that, and the notion would be that you would be directing this

24    second, if you will, assessing psychologist or psychiatrist to

25    prepare a report that would be available to the government, to

1    Probation, and the Court or?

2          MS. GANT:  I -- I would ask for the same psychologist

3    to do it --

4          THE COURT:  Okay.

5          MS. GANT:  -- but for the -- but for her to just come

6    sooner rather than the comprehensive report --

7          THE COURT:  Yes.

8          MS. GANT:  -- which will take a longer time to conduct

9    an evaluation and produce an abbreviated report.

10         THE COURT:  Okay.

11         MS. GANT:  I will just say that, you know, I have some

12   concerns.  Obviously, your Honor touched on it in terms of

13   Ms. Lara being required to agree to it.

14         THE COURT:  Okay.

15         MS. GANT:  It's frankly impossible to divorce an

16   admission implicating Fifth Amendment, you know, it's the kind

17   of --

18         THE COURT:  Yeah, ah, no, this is -- we're operating,

19   you know, and I just said and meant it that just because you

20   have made a statement doesn't mean you need to take any -- make

21   any more.  And the Fifth Amendment of the Constitution is still

22   the law of the land.  It's really then a question of under your

23   good offices as counsel for Ms. Lara your assessment, I think

24   there may be advantages in terms of getting to -- for me to get

25   to a nondetention disposition.  This would be very helpful to

1     get some comfort on public safety and risk of self-harm here.

2               MS. GANT:  I think we're open to that.

3               THE COURT:  Okay.

4               MS. GANT:  It's -- and again if it were kind of

5     narrowed and -- I don't want to say abbreviated, because I

6     don't intend for it to be given short shrift but --

7               THE COURT:  But -- but I think it can be -- you know,

8     there's a difference between a report that is reporting to

9     Probation, the government, and the Court.  What are the risks

10    of self-harm, public harm, risks of actual violence or risk of

11    continued threats, because one of the things I think people

12    lose site of is that people say, well, I just made the threat;

13    I was never going to do anything.  The threats themselves

14    produce fear, harm.  Often increasingly we're seeing they lead

15    to physical harm in a variety of ways as well.  So the threats

16    are a serious concern.

17              So I'm looking for something I -- you know, I don't

18    think I need to know what this person advises as far as further

19    clinical treatment for Ms. Lara.  You know, that's the area

20    where I think if we're going to try and draw an arbitrary line

21    to give a space of privacy for healing and self-care that is

22    needed, protection of the public and assessment of this

23    situation, it's not -- it's never going to be a perfect line,

24    but that's roughly where I would draw it is really drawing

25    on -- on the statute of 32 -- 3142, you know, what is the

1    safety issue is -- is really where the Court's interest is

2    paramount and the clinical either prognosis or recommendations

3    are less to the point, although it may be that there we need to

4    include conditions that say, you know, continued clinical care

5    is going to be a condition of release.  I can tell you I can't

6    really picture how we don't say that under these circumstances

7    but --

8           MS. GANT:  Agreed.

9           THE COURT:  Yeah.

10           MR. McNEIL:  I mean, I haven't had a chance to

11    speak --

12           THE COURT:  Yeah.

13           MR. McNEIL:  -- and I thought we were going to do

14    this internally --

15           THE COURT:  Oh, yeah, absolutely.

16           MR. McNEIL:  -- instead of have a conversation, but

17    I'd actually like an opportunity to speak.

18           THE COURT:  Yeah, absolutely.

19           MR. McNEIL:  Your Honor, all you know so far is that I

20    have moved for detention --

21           THE COURT:  Uh-huh.

22           MR. McNEIL:  -- and you know from the package of what

23    I sent your clerk is that I think that there are conditions of

24    release that you can impose in this case which would -- which

25    would prevent the need --

1          THE COURT:  Uh-huh.

2          MR. McNEIL:  -- from -- from having to detain her.

3          THE COURT:  Okay.

4          MR. McNEIL:  But I think that those conditions must

5     include home detention for at least a time, and I think those

6     conditions must include an evaluation.  I don't know the

7     psychologist exactly who she's speaking of, but it has got to

8     be someone that's neutral and someone that all of us, pretrial,

9     the government, and the Court can rely upon and that we can

10    feel some confidence in.

11          So -- so -- and there are a couple of other terms that

12    I would suggest, and I'm just looking at Probation's list of

13    terms.  So I agree with -- with everything.  I'm looking at

14    page 4 and 5 of Probation's recommendations and our Pretrial

15    Service recommendations.  I agree with all of this.  I agree

16    with the third-party custodian, such as her mother makes sense.

17    These conditions 1 through 13 make perfect sense as well to me.

18          I think that at a minimum there should be home

19    detention for a time, and I'll speak to that in a moment, in

20    addition to these conditions.

21          In addition, I think there should be a couple of other

22    conditions.  First, that she not go to or inquire about any

23    shooting ranges.  In addition to this, she can't possess a

24    firearm or destructive device.  Although on home detention she

25    wouldn't have that opportunity, but I think that should be in

1    there.

2           Secondly --

3           THE COURT:  Is there any objection to that as a -- I'm

4    seeing a shaking head from Attorney Gant.  I take it no

5    objection to including shooting ranges and inquiries about

6    shooting ranges?

7           MS. GANT:  Absolutely no objection.

8           THE COURT:  Okay.

9           MR. McNEIL:  I think that -- I think that I'm -- also

10   a recommendation that she not use social media at all or any

11   encrypted -- any social media communications platform or any

12   encrypted communications platform.  She can use her computer to

13   look up things on the internet, to go to school, to communicate

14   via email and text with people she knows.  And let me explain

15   why.

16          THE COURT:  Yeah, I think I understand why, but my

17   biggest concern is simply practicality, and this is a

18   generational thing.  If social media disappeared tomorrow, my

19   life would be a little simpler, and that's about it.  For

20   somebody --

21          MR. McNEIL:  Well, your Honor --

22          THE COURT:  -- of her age, I suspect that social media

23   is a major source of such connection as she has to peers or

24   friends, and my concern is that a combination of home detention

25   and eliminating social media could lead to dangerous isolation,

1    so if you could address that.

2         MR. McNEIL:  No, and that's a point which I appreciate

3    if that you're struggling with home detention and these kinds

4    of things makes a situation better or worse, I think given how

5    little we know about what's going on in her head and what

6    caused a person of her age and experience to engage in the kind

7    of conduct she did, we don't know.  And while that mystery

8    still exists we need to protect the public.  That's where it

9    comes down to.

10         And so I agree that any kind of home detention, any

11   kind of incarceration, any kind of limitation on social media

12   will have a deleterious effect on Ms. Lara, and an effect which

13   I don't wish upon her, nor which do I ask the Court.  But our

14   obligation is to protect someone who has allegedly committed a

15   crime, you know, from engaging in additional criminal conduct.

16   The balance now must be struck in -- in -- in weighing most

17   heavily for public safety.

18         Once and if we start to solve that mystery, through

19   a -- through an informed report by a clinician that we can rely

20   upon that she doesn't pose this risk then -- then the

21   government is going to be very amenable to much looser terms.

22   But while the mystery exists, we -- I think we owe it to the

23   public.  We owe it to the elderly people in AdviniaCare

24   facilities to say your safety, rather than her mental health,

25   has to be prioritized, even though we're not forgetting about

1     her mental health at the same time.

2          So I agree that social media will isolate her, but for

3     a time she -- she's demonstrated she's using social media to

4     engage in threatening conduct.  For a time it should be

5     curtailed.

6          THE COURT:  Let me ask Ms. Gant.  I -- I hear some

7     wisdom in what Mr. McNeil is raising.  How long do we think it

8     would take, because Mr. McNeil is right that right now we are

9     looking at a mystery.  I think I've admitted as much that I see

10    different pieces of the puzzle, but I certainly don't have the

11    expertise to figure out how they fit together, and it does

12    strike me that knowing more about that makes it certainly

13    easier and certainly improves the Court's confidence in feeling

14    that we've struck a correct balance between assuring the safety

15    of the public and looking out for the defendant's mental

16    health.

17         Is -- is there a time -- does it makes sense to agree

18    to home detention and essentially -- essentially a lockdown of

19    social media connections until such time as we get a report

20    assessing the defendant's -- the dangers associated with the

21    defendant?

22         MS. GANT:  She'll comply with whatever the Court

23    orders, but I --

24         THE COURT:  I'm sure of that.

25         MS. GANT:  Yes, but -- but I --

1          THE COURT:  It's a different question from what I'm

2    asking now.

3          MS. GANT:  But I -- yeah.

4          THE COURT:  I'm really asking about time frame and

5    whether it makes sense if -- if you're in a position to

6    propose -- and I'm sure you can't speak for somebody who isn't

7    here to tell you what because of her schedule is, but if you

8    have a -- does it makes sense to temporarily agree to a home

9    detention condition subject to revisiting upon receiving

10   additional information?

11         MS. GANT:  So I'm amenable to producing what I think

12   is a feasible timeline to be able to produce a psychological or

13   psychiatric evaluation.  I think something like 60 days would

14   be appropriate, and the reason I say that is because this isn't

15   going to just be an interviewed-based, you know, kind of

16   single --

17         THE COURT:  Right.

18         MS. GANT:  -- analysis.  It's going to review the

19   records and collateral --

20         THE COURT:  It's going to require a lot of con --

21         MS. GANT:  And in that --

22         THE COURT:  -- context.

23         MS. GANT:  And in that context, I'll have separate

24   discussions with Mr. McNeil about waiving the time to

25   indictment so that we can at least kind of see where we're at.

1          THE COURT:  Uh-huh.

2          MS. GANT:  But in terms of imposing a condition until

3     we receive those results that involves either home detention or

4     a lockdown on social media, I don't think that's necessary, and

5     I just want to explain why.

6          Given the parameters that the Court seems prepared to

7     set on -- on Probation's -- or Pretrial Services proposed

8     Condition Number 9 about the evaluation and what it would

9     entail.  I think we're in full agreement with Pretrial Services

10    and with the addition of the no shooting range inquiry or

11    visiting or anything like that.

12         To put somebody who's depressed, frankly, on a home

13    lockdown where they are not able to either see other areas, go

14    out, visit friends, it is frankly a recipe for mental health

15    disaster.  And in speaking with Probation -- with Pretrial

16    Services before now, my understanding is that it's their

17    intention to assign a senior probation officer who is more

18    well-versed, more well-skilled to be able to engage Ms. Lara

19    and monitor her.

20         And requiring her to abandon social media accounts, I

21    mean I understand where the point is coming from, because

22    obviously there are these pseudonym accounts that were created

23    and were sending messages from her phone.  But there's also --

24    there's utility in being able to maintain connections for

25    somebody who already feels so isolated in her grief.  And I

1   hate to say it's the way the kids these days communicate,

2   whether it be Facebook, TikTok, social media, it's how they

3   engage with each other.  And it may not be that they're -- they

4   do send messages, but it's also how they keep up with each

5   other's lives.

6           THE COURT:  Okay.

7           MS. GANT:  And I think that there -- I respect

8   Mr. McNeil's point that the safety and security of the victims

9   in this case and the public need to be considered, absolutely.

10  And we aren't in a -- in a scenario where we're kind of in a

11  do-no-harm approach towards Ms. Lara, but I think it has to

12  be -- the conditions have to not just be tailored to the safety

13  of the public, but also, I think, to ensure that there is no

14  future reoffending or relapsing behavior or any kind of -- kind

15  of recurrence of symptomology that would cause a problem.

16          And I think that -- I think that the -- my concern is

17  that imposing such restrictive conditions on somebody who is

18  depressed only serves to further isolate them --

19          THE COURT:  Okay.  I understand.

20          MS. GANT:  But with that said, I will still abide by

21  whatever the Court --

22          THE COURT:  I understand that concern.  Let me ask

23  this.  There -- I'm sure there is not yet a new normal for

24  Ms. Lara.  I'm sure there's not yet a new normal even after

25  what normal is going to look like after the loss of her sister,

1    let alone after now facing consequences for conduct after that.

2    That said, what -- what does a typical day look like?

3    What -- I'm just interested, for example, is this a situation

4    where curfews makes sense.  What does home custodian -- I'm

5    just trying to explore what is the impact of a stay-at-home

6    order compared to how she's living right now.

7         MS. GANT:  So I think a curfew would be fine.  I don't

8    have a problem with that.  We don't really even have a problem

9    with GPS monitoring if -- to ensure that she's not going to

10   AdviniaCare.

11        THE COURT:  Yeah, I mean the GPS piece, I'm not so

12   inclined to do a GPS on it.  It's -- there are situations where

13   it can be a very useful tool, but if we're dealing with

14   impulsive behavior, it's not fast enough generally to solve

15   that problem, and so I'm -- I'm not -- not necessarily

16   inclined to -- if -- if safety of the community is at issue,

17   I'm not sure GPS gets us there.

18        MS. GANT:  So I think -- I think a typical -- I mean,

19   a typical day obviously is in flux right now --

20        THE COURT:  Right.

21        MS. GANT:  -- depending on how things --

22        THE COURT:  But is she attending classes?

23        MS. GANT:  She's attending classes online.

24        THE COURT:  Online or in person?

25        MS. GANT:  Online.

1          THE COURT:  Okay.

2          MS. GANT:  And she -- she rarely goes out at night

3   with friends.

4          THE COURT:  Uh-huh.

5          MS. GANT:  And that's principally, I think, because

6   she has been --

7          THE COURT:  Well, it's been a horrible time in her

8   life.

9          MS. GANT:  -- not feeling well, not feeling like

10   herself.  But she does assist.  She has a younger 7-year-old

11   sister.  Mom works.  Mom takes her to therapy on Friday weekly.

12   So I think having at least the ability to engage with the

13   community in positive productive ways, and we'd like to see her

14   working again.  And so I -- I think a curfew would be fine.

15   Probably enforced by mom as third-party custodian.  That might

16   be appropriate, but again, she'll -- she'll --

17          THE COURT:  Yeah, I'm -- I'm inclined -- Mr. McNeil.

18          MR. McNEIL:  Your Honor, I -- I appreciate the process

19   you're going through, which is trying to -- trying to find a

20   refined way to address all of these issues, but I -- I just

21   feel compelled to make this argument.  We haven't heard from a

22   qualified psychologist that the kinds of threats that were

23   issued over a four-day period, which including -- which

24   included your days are fucking numbered, violence is always the

25   answer, is caused by depression.

1          THE COURT:  Uh-huh.

2          MR. McNEIL:  We have not heard that.  We do not know

3     and nor have we heard of any -- I have never heard of a case

4     like this --

5          THE COURT:  Uh-huh.

6          MR. McNEIL:  -- that someone like this would use that

7     kind of language.

8          Now, my -- I think we will find over time that social

9     media is what has caused this, that is to say, that her

10    involvement --

11         THE COURT:  Or -- or at least has allowed this

12    behavior to -- to flower.  It has disinhibited certain kinds of

13    behaviors that might not be --

14         MR. McNEIL:  Right --

15         THE COURT:  -- characteristic of face to face.

16         MR. McNEIL:  Right, the language in these -- the

17    language in these --

18         THE COURT:  Right.

19         MR. McNEIL:  -- threats, it comes from the world of

20    the grievance, social media, right.  And so the idea is, like,

21    oh, she can't function, you're not in a world of social media.

22    Well, you know what, she needs to learn how to do that starting

23    now.  All right.  Because it may be that that's what's exactly

24    missed, but we don't know.  We have no expert testimony of

25    that.

1          And the idea that we're talking now about, well,

2     maybe -- maybe a curfew for a little while and maybe we let her

3     out sometimes, I think what's important now is we set some

4     stringent conditions and then we get some good advice about her

5     mental health.

6          THE COURT:  Uh-huh.

7          MR. McNEIL:  And these conditions we're setting, they

8     don't need to be for six months or eight months.  They could be

9     for three weeks.  They could be for a month.  They could be for

10    a very short period of time until we're better informed, and

11    we'll also have a better insight into her phone as well.

12         One other point I'd like to make, although I don't

13    think this can be a term of pretrial release.  I actually think

14    this is one case where a defendant would benefit extensively by

15    restorative justice, right, when you have someone who

16    is very -- you know, it's the first time she ever committed,

17    you have a really big victim community, you have the kind of

18    self-analysis that comes through that process.  I'm not -- I

19    don't know to what extent the Court can be involved in

20    referring that.

21         THE COURT:  Yeah, I don't -- I don't think I can be or

22    will be, but I will tell you from my own experience with

23    restorative justice, particularly with people -- I'm under an

24    obligation of confidentiality for any particulars that I may

25    have seen in restorative justice settings, but I have seen an

1    aspect of the restorative justice process which is the building

2    of empathy with victims understanding the impact of behavior as

3    an important part of both self-understanding and healing to be

4    something that can be very valuable.  I'm not going to

5    order -- I don't think I can order it as a condition.  I also

6    don't think it works to order it as a condition of release.

7         I would commend to Ms. Gant to consider it, because in

8    particular I think there may be something in -- and Mr. McNeil

9    is right, we are all guessing to a degree, but there may be

10   something to the notion that in an online world people simply

11   lose the ability to recognize that their words have a

12   consequence.  They send them out into the ether.  There's no

13   immediate response or there's often an echo chamber or even a

14   magnifying response to words and behavior that in other

15   settings are absolutely repugnant, and I have seen in the

16   context of restorative justice people who did acts that

17   endangered the public in conditions of rage, indignation, or

18   anger, who did -- I have seen people take advantage of the

19   opportunity to understand that even if you're sitting alone at

20   a keyboard there are human beings that your acts have an impact

21   on, and learning to understand that and appreciate and

22   recognize that can be a very important piece of progress so

23   that -- and as well as, frankly, the opportunity to talk to

24   other people who have just as much reason to be humiliated and

25   ashamed to be there as you do and understanding that you're all

1     going to move through your lives and move on and grow.  I do

2     think there's a potential from the little I see here, and again

3     I'm going to repeat that I don't know -- what I don't know is

4     much greater than what I do know from seeing things, but I

5     think -- I think it is worth raising.

6          Mr. McNeil, I guess my question is this.  The time

7     frame is longer than I quite expected.  I wasn't expecting

8     60 days before we would have some assessment, but I also don't

9     know how long these things take.  I really don't.  And it's

10     a -- it's a tough issue.

11          MR. McNEIL:  Well, your Honor --

12          THE COURT:  I does strike me --

13          MR. McNEIL:  -- let's -- let's find out.  Rather

14     than -- rather than make a decision today about all these other

15     conditions, let's find out.

16          THE COURT:  Okay.

17          MR. McNEIL:  Let's find out from the psychologist.

18          THE COURT:  That makes some sense to me, but let me

19     raise the second point that does strike me as significant,

20     which is it sounds like financially to be the case and

21     potentially -- well, for lots of reasons, I think people ought

22     to work.  I just think that's -- you know, we -- we often speak

23     of home detention in terms of permission to leave for worship,

24     work, and food shopping, and that's what it -- one of the

25     things I'm thinking about is here she would be seeking work and

1    finding work while you've got a pending federal charge is not

2    easy, but it is doable, and there are employers who need help,

3    and Probation can often help people in that process.

4            I'm -- I'm thinking again that that is likely to be a

5    piece of keeping somebody safe and connected and moving forward

6    in the community, that that may be safer than trying to lock

7    somebody at home.  If -- if it's not safe to allow Ms. Lara out

8    into the world, my inclination would be then to say she needs

9    to be locked up in a facility.  Home detention strikes me as

10   potentially having some of the worst of both worlds here.  In

11   other words, it provides much less protection for the public

12   than incarceration does, and it may -- and it may provide fewer

13   supports and protections for the individual.  That's my

14   concern.  In saying that I'm not proposing detention of -- in a

15   facility.  I'm just concerned that, you know, what would be

16   called full home incarceration may be more deleterious to the

17   defendant and less protective of the public.  It may do less

18   for us on both scores.

19           MR. McNEIL:  And to be quite candid, your Honor,

20   that's why I moved for that.

21           THE COURT:  Yeah.

22           MR. McNEIL:  I wanted to give the Court the option to

23   weigh this complicated situation.  I don't think --

24           THE COURT:  Yeah.  No, I appreciate it.

25           MR. McNEIL:  I don't think for phase one of release

1     that it is sufficiently protective to the community to release

2     her beyond home detention for phase one.

3                THE COURT:  Okay.

4                MR. McNEIL:  Now, maybe in phase two it would --

5                THE COURT:  But when you -- when you use the term

6     "home detention," do you mean full home incarceration?  Okay.

7                MR. McNEIL:  I do, your Honor.

8                THE COURT:  That's what you're proposing.

9                MR. McNEIL:  I do.  But, you know, if she were to find

10    a job, I mean, if -- if -- if we're going to ask her to get a

11    job then I would -- I'm sure the victims in this case would

12    say, she may not seek employment with a vulnerable population.

13               THE COURT:  Oh, no, we're going to --

14               MS. GANT:  No objections, your Honor.

15               THE COURT:  Any -- any -- any job hunting in any job

16    is going to be subject to close review and prior notice with

17    pretrial supervision.  It sounds like one of the many sad

18    things here is that it sounds like Ms. Lara was good at her

19    job, and it may have important qualities of empathy and ability

20    to connect at least in person that for the time being she's

21    going to have difficulty bringing to bear in a job.  Right now

22    I'm talking about just a paycheck and being gainfully connected

23    to the community as opposed to sitting at home in an apartment

24    in a house of mourning --

25               MR. McNEIL:  Can I say just one thing to add --

1          THE COURT:  -- potentially --

2          MR. McNEIL:  -- just for a different perspective.

3          THE COURT:  Yeah.

4          MR. McNEIL:  We always think of -- many times think of

5     home detention as just like a jail cell at home.

6          THE COURT:  There's --

7          MR. McNEIL:  She has got a very supportive family.

8          THE COURT:  Right, and a younger sister who needs her

9     help.

10         MR. McNEIL:  She has got a younger sister who are

11    here.

12         THE COURT:  Uh-huh.

13         MR. McNEIL:  Why not look at this phase one period as

14    a time for her to reflect on her social media use and instead

15    of directing her attention towards that world, directing her

16    attention to something like restorative justice.  This might be

17    a period of -- she is presenting herself as a very thoughtful,

18    articulate, well-written person.  Her threats are amongst the

19    best written, the most grammatical that I have read, I have to

20    admit that.  The same with the stuff on the -- on the social

21    media site.  So -- so maybe this is an opportunity.

22         THE COURT:  Oh, if it --

23         MR. McNEIL:  All right, Judge.

24         THE COURT:  I mean, broadly speaking, and again I take

25    your point but, you know, what we have here is way beyond a

1     wake-up call.  I have no doubt that Ms. Lara is aware that

2     something at a minimum in her life and her behavior is out of

3     line to the point that the federal government is charging her

4     with a crime; and if that isn't a good occasion to be asking

5     really hard questions about how did you end up here, and what

6     kind of help do you need, because most people need help to get

7     out of this situation.  I think the wake-up call aspect, I

8     think, is adequately covered.  The real question to me is what

9     would a workable condition look like, and what does this home

10    look like?

11          It sounds like Ms. Lara's mother does need to leave

12    the home to go to work, so it would mean Ms. Lara being at

13    home.  It sounds like Ms. Lara has some obligations to help

14    care for a younger sibling in the home so that would be work at

15    home to help out with that, if I'm understanding that

16    correctly.

17          I think what I would propose, and I'm -- I'm sorry to

18    keep throwing out thought balloons rather than giving a final

19    ruling, but this is a difficult case.  Typically, as both of

20    the lawyers know, these don't take this long.

21          I am inclined to order home detention on the

22    understanding that Ms. Gant will pursue getting us a timeline

23    for getting more information to consider how to adjust those

24    conditions of home detention.  I think initially the conditions

25    of home detention do require refraining from use of social

1    media, and I have no doubt that will be extremely difficult.

2    It will permit use of a telephone, but -- use of telephone the

3    way I think of a telephone, meaning people talk to each other,

4    which is different from almost -- and I suppose -- I think I

5    would allow use of one-on-one text, but no chat rooms, nothing.

6    So no chat threads and no broader social media, TikTok, Insta,

7    any of that.  In the near term, I think we just need to shut

8    that down until we get a better picture of where Ms. Lara is.

9              THE COURT:  Ms. Gant.

10             MS. GANT:  And would the Court if -- if Ms. Diaz, as

11   third-party custodian, logs out and deletes those apps from the

12   phone and monitors use would that be sufficient?

13             THE COURT:  I think so on the understanding that it's

14   also going to be subject to verification by Probation, and I'm

15   mindful that this is really difficult forensically to stay on

16   top of, but I will be making very clear that anyone who wants

17   to bet their liberty on the assumption that they're going to

18   outsmart potential forensic failure is making a terrible

19   mistake.  It may be that in the short run these things are not

20   noticed, and you think you've gotten away with it.  It's

21   nothing to mess with, because we'll be getting into this

22   discussion in a minute of conditions of release.

23             Ms. Lara, what we're going to be talking about a

24   minute -- in a minute is something that is going to be kind of

25   new to you and really important, which is that every condition

1    the Court imposes upon you becomes effectively the law.  It

2    means that any violation of any condition, even if you think

3    you're getting away in the short run, if we later find out you

4    violated one of these conditions, it can lead to your being

5    detained, and that means sitting in jail waiting for your

6    trial.  So it's just nothing you want to mess with.  You know,

7    it's -- I don't know what you were thinking or whether you were

8    thinking when you made the threats here, but for good reason

9    the Federal Bureau of Investigation responded and the federal

10   government.  You have their complete attention as well, and

11   that's just nothing you want to mess with.

12         Mr. McNeil is working hard within his obligations to

13   protect the public to give you as much opportunity as he can to

14   move forward with your life, but any suggestion that you're not

15   able to abide by these conditions puts him and the Court in a

16   position of saying, okay, this isn't somebody who can abide by

17   conditions, who will abide by conditions.  So that's -- that's

18   going to be a critical piece of this.

19         So my -- I think what I'm going to do is order as

20   conditions the conditions proposed by Probation plus for the

21   near term and subject to reopening, meaning, Ms. Gant, if you

22   can inform the Court as well as Mr. McNeil when you have a

23   sense of when we can get a report, we can potentially revisit

24   conditions in light of that --

25         MS. GANT:  Absolutely.

1          THE COURT:  -- but the -- but the conditions for

2     as -- as of right now will be home detention with permission to

3     leave only on prior approval by Probation to seek work or to

4     attend worship services.

5          MS. GANT:  And to attend counsel meetings and therapy.

6          THE COURT:  And to attend counseling, therapy, and

7     other medical appointments.

8          MS. GANT:  Okay.  And we would agree, just because

9     Mr. McNeil raised it, to an extra condition that all work be

10     approved by Probation and not work with vulnerable

11     populations --

12          THE COURT:  Yes.

13          MS. GANT:  -- we don't have an objection to that.

14          THE COURT:  Okay.  So -- so work -- I think I'm going

15     to leave it as subject to approval by Probation, although I

16     suppose it doesn't hurt to add it as a condition, specifically

17     shall not include working with vulnerable populations.  I just

18     don't know which jobs in particular Ms. Lara is likely to be

19     applying for and where they are.  And I have great faith in the

20     Probation officers and their judgment in monitoring and

21     supervising this.

22          So actually, I will make the condition simply subject

23     to prior approval by Probation and leave it to their judgment

24     and discretion as far as what kinds of job seeking and what

25     kind of jobs would be appropriate.

1           And I will order no use of social media and deleting

2     all social media apps from any phone or device that Ms. Lara

3     has access to.  Will permit use of voice telephone, voice

4     calling, and chat function -- or texting function, I should

5     say, on a one-on-one basis, but no group texts.

6           MR. McNEIL:  Can I -- can I just add one refinement to

7     that?

8           THE COURT:  Yeah.

9           MR. McNEIL:  No -- no communications through

10    pseudonyms.

11          THE COURT:  Yes.

12          MS. GANT:  No objection.

13          THE COURT:  No use of any other -- it's all going to

14    be in your name.

15          THE DEFENDANT:  Yeah.

16          THE COURT:  Whatever comfort you may have found in

17    operating anonymously or trying on alter egos, it's not

18    available now.  It's -- it's not something you can do.

19          I think those conditions plus the conditions outlined

20    by Probation --

21          PROBATION OFFICER PAIVA:  Your Honor.

22          THE COURT:  -- is more I need to hear so.

23          PROBATION OFFICER PAIVA:  I am going to say on behalf

24    of the Probation office with specific to the home detention

25    conditions, just for the record, Probation is not requesting

1    home detention under the same concerns that defense counsel

2    happened as a whole, but as the Court is inclined to impose

3    home detention, the agreed detention is also that she may leave

4    the house with prior approval from Probation, but we do request

5    that the equipment use of that technology would be left to the

6    discretion of the Probation office.

7        THE COURT:  Yes.  Yeah, I'm not sure technology is

8    going to do much for us here.  And again, I have great faith in

9    the judgment and discretion of the Probation office in that

10    regard.

11        MR. McNEIL:  Your Honor, if I may just by way of

12    observation, although I agree with leaving it to the

13    discrimination of Probation.  One thing that that technology

14    does is it lets you know when the defendant starts testing the

15    limits.  That's what it does.  So it doesn't prevent the crime.

16    But if the defendant decides I'm going to go out and party all

17    night, no crime, but it's a violation.  All of a sudden it

18    allows them to start reeling them back in.

19        THE COURT:  I understand that.  I'm going to leave it

20    to Probation's discretion in part because the total available

21    bandwidth for monitoring and using the equipment is also

22    limited, and I -- I think it's just essential to give them the

23    latitude to use their best judgment as to how and where to use

24    this kind of equipment.

25        PROBATION OFFICER PAIVA:  Can I just to clarify for

1    counsel.  The request for that is to allow the Probation office

2    to select the type of technology, but she will have technology

3    installed on her person as well as the (indiscernible).  The

4    suggestion just gives us a little bit of flexibility as we

5    assess her home and (indiscernbile).

6         We would also request that the Court order that

7    Ms. Lara is responsible for the cost of that technology as

8    assessed by the Probation office, and we will assess what her

9    responsibility will be.

10        And then lastly that a warrant in abeyance will be

11   issued, and I would just note for the record that Probation is

12   in agreement with coming back on a 30-day status conference

13   just to check in on how she's doing with home detention, if it

14   continues to be necessary, and where we're at with our

15   psychiatric assessment.

16        THE COURT:  Okay.  So we will set this for a 30-day

17   status conference and hope to have an update as well about an

18   assessment, which will allow us to consider where we are on

19   conditions.

20        MS. GANT:  Absolutely.  Sixty days was my kind of,

21   like, outside best guess just based on a number of factors, but

22   given the Court's willingness and the government's willingness

23   to entertain a possible modification in the future, the fire is

24   under me to get this done.

25        THE COURT:  Okay.

1          MR. McNEIL:  Your Honor, just --

2          THE COURT:  Yes.

3          MR. McNEIL:  -- for clarity.  She has a -- a right to

4   a preliminary hearing in 21 days.  So I -- if -- I'm totally

5   fine if she's going to waive that right to have a preliminary

6   hearing within 21 days, but I just want to make sure we keep

7   track of it.

8          THE COURT:  Yes.

9          MS. GANT:  Waived.

10          THE COURT:  Ms. Lara, I need to ask you about that.

11   Your -- your lawyer has given advice and told me you wish to

12   waive this.  The preliminary hearing is a process.

13   Typically -- and I'm going to have to take a couple of steps

14   back to explain what we're talking about here, but since it's

15   your right it's important to me to make sure that we have your

16   waiver on the record.

17          Typically, when somebody is charged with a crime in

18   federal court they can be charged by a complaint, as you were,

19   meaning an agent provides information to the Court suggesting

20   that the crime has been committed; and on that basis, a warrant

21   for arrest or in this case a summons can be issued.

22          But before somebody can be charged ultimately with a

23   federal crime in the federal court, a grand jury has to return

24   what's called an indictment, which would be a decision by a

25   group of independent citizens that there's enough evidence to

1    warrant bringing a crime.

2           In between the time of a complaint and the time of an

3    indictment, if there's a long delay, a delay of more than a

4    week or two, you have the right to come to a judge, that would

5    be me, and say to the government, you know, I got arrested on

6    this complaint, it's time for a judge to at least look at this

7    thing and figure out is there probable cause to believe this

8    happened.  And that's a right to protect you until -- unless

9    and until such time as a grand jury actually returns an

10   indictment.

11          So what Ms. Gant is telling me is that you would like

12   to waive that right and not have a hearing to look into whether

13   there's probable cause to believe you did this.  You're not

14   giving up your right to a trial, if at the end of the road you

15   are contesting these charges, but you would be giving up your

16   right to have me make a separate assessment apart from the

17   initial review of the warrant and -- review of the complaint

18   rather in order to avoid having the hearing about what

19   happened.

20          So does that -- have I explained that well enough to

21   make clear to you what we're asking you to consider whether you

22   want to give up?

23          MS. GANT:  I think you have.  If we could just have a

24   moment.

25          THE COURT:  Sure.

1          (Counsel conferred with the defendant.)

2          MS. GANT:  Okay.

3          MR. McNEIL:  Your Honor, just one other thing.  We

4     haven't talked at all about -- about substances, substance

5     abuse, and possibly of that.  I would suggest that we include

6     it in this short-term evaluation, and that it includes a

7     substance abuse evaluation because we don't really know what

8     caused this, and we don't know if it played a factor or not.

9          THE COURT:  Ms. Gant, any objection to including that

10    in the considerations here?

11         MS. GANT:  She's going to be tested as part of the

12    proposed conditions.  Certainly any psychological evaluation

13    takes into account substances.  I just don't think a separate

14    substance abuse evaluation is necessary.  We can incorporate it

15    to -- within this psychological evaluation.

16         THE COURT:  Okay.

17         MS. GANT:  I have no objection to that being addressed

18    as part of the evaluation.

19         THE COURT:  Okay.

20         PROBATION OFFICER PAIVA:  Your Honor, the Probation

21    office will agree with defense counsel.  In the event that

22    concerns are raised in Ms. Lara's drug testing results, we

23    would be happy to revisit that, but at this time we do not

24    identify any risk or need for a full substance abuse

25    evaluation.

1              THE COURT:  Okay.  So --

2              MS. GANT:  I did just want to make --

3              THE COURT:  Allow me one moment.

4              MS. GANT:  Sure.

5              THE COURT:  I'm just trying to keep track of where we

6      are in terms of additional conditions.

7              So we were in the middle of asking Ms. Lara whether

8      she wishes to waive her right to a preliminary hearing.

9              THE DEFENDANT:  Yes.

10             THE COURT:  Okay.  Yes, you do wish to waive that

11     right?

12             THE DEFENDANT:  Uh-huh.

13             THE COURT:  Okay.  All right.  In terms of timing,

14     Ms. Dumoulin has pointed out to me that I'm not here in

15     30 days.  I'm going to be away.  So I think we're looking at a

16     little longer period.

17             What was the date that was available, Ms. Dumoulin?

18             THE CLERK:  March 8th.

19             THE COURT:  March 8th.

20             MS. GANT:  I think I'm free that whole day, your

21     Honor, so whenever the...

22             THE COURT:  All right.  Mr. McNeil.

23             MR. McNEIL:  I have a sentencing at 2:00 and another

24     matter from 10:00 to 11:00 time but otherwise...

25             THE COURT:  Okay.  Do we have a spot we could

1    accommodate everybody happily?

2              THE CLERK:  11:00.

3              THE COURT:  11:30?

4              THE CLERK:  We could do 11:30 on March 8th.

5              MS. GANT:  Great.

6              THE COURT:  Okay.  That makes sense to me.

7              All right.  So I'm going to go ahead and order

8    Ms. Lara released to home confinement, subject to conditions

9    that she may seek work and leave to go to work upon prior

10   approval by the supervising pretrial officer.  She again may

11   leave work subject to advance notice; and if it's a regular

12   event, you can work out a schedule with Pretrial.  If you go to

13   see your clinical the same day each week, you can go over that

14   with your probation officer, but they need to know when you're

15   leaving and why and the -- and the permitted purposes for

16   leaving the house are to seek work or to go to work, to go to

17   medical appointments, including therapy, and to go to religious

18   services.  And that's it.  Otherwise, you're going to be at

19   home, and the condition will be to remove -- and I'm going to

20   be talking to your mother about this, because she's going to be

21   your custodian -- to remove any social media apps from any of

22   the devices that you're using, and your use of telephone is

23   limited to voice calls and one-on-one texting.

24              You will be subject to electronic monitoring as

25   directed by the Probation office, and they will make

1    appropriate arrangements for that.

2            You will be required to pay the costs of that

3    monitoring.

4            We will issue a warrant to be held in abeyance, and

5    let me explain what that means.  It means that there will be a

6    warrant already signed.  If there's any violation of any of the

7    terms of the electronic monitoring and the rules that you have

8    to follow in order to abide by, use the electronic monitoring

9    exactly the way the Probation office tells you to, if there's

10   any violation of that, there's already a warrant for your

11   arrest.  It means people are going to come and take you away

12   so.

13           I'm not going to order a separate substance abuse

14   assessment, although I will note that it would be useful to

15   have an assessment of that as part of the broader psychological

16   assessment.  It will be a condition of this release that the

17   defendant undertake a psychological assessment separate from

18   her current clinical treatment, an assessment that can be

19   provided by -- to the Court and that could be used, among other

20   things, to assess whether we've got the right kinds of

21   conditions in place both, primarily as Mr. McNeil points out to

22   protect the public and its safety, but also to consider whether

23   there may be changes that make sense in terms of the

24   defendant's welfare as well.

25           I believe it's that plus I think it's all of the

1    conditions described in the Probation report.

2            Any objection, counsel?

3            MR. McNEIL:  I think that's it.

4            THE COURT:  Okay.

5            MS. GANT:  I think that's it.

6            THE COURT:  All right.  All right.  So we may have to

7    do a little rewriting to get all of that in writing, but let me

8    take a few minutes now and, Ms. Lara, I'll tell you what --

9    what's coming just so you know.

10           One of my obligations is to tell you exactly what

11   these conditions mean and what can happen if you mess up, and

12   it's -- you know, I will tell you it's something we do with any

13   defendant who is released, so I'm not singling you out; on the

14   other hand, I mean every single word of it.  So it's essential

15   to listen carefully.  I will generalize -- one thing I'll say

16   is the conditions of release are going to be spelled out in

17   writing for you, and I believe -- actually, you know what, the

18   one thing I -- one additional condition, and the defendant

19   shall be released to the custody of her mother, who will be a

20   third-party custodian.

21           With the conditions of release, they're going to be in

22   writing.  You have a really good lawyer, who's available to you

23   and who has a track record of making herself available to

24   defendants who need help.  Do not ever come up with your own

25   interpretation or your own reading of these conditions of

1  release.  If you're wondering whether you're allowed to do

2  something or not, talk to your lawyer and take her advice.

3        Now, I was just reminded that I need to include among

4  the conditions of release not only the elimination of social

5  media apps from any devices being used, but also you are not

6  under any circumstances to communicate under any pseudonym, any

7  fake name, any anonymous name.  You're not to disguise your

8  identity in any communications.

9        But what I -- what I was in the process of saying was

10  you've got a chance to talk to an attorney.  If you're

11  wondering what you're allowed to do and what you're not allowed

12  to do, talk to her.  It's -- you've got -- you know, it is up

13  to you, and it is your responsibility to understand what's

14  required and what can happen if you fall short on any of this.

15        So, first of all, and I've mentioned this before, but

16  you need to know you have been charged with two federal crimes

17  already.  Violation of any condition of release is another

18  federal crime.  So if you violate any of these conditions of

19  release, a judge can issue an arrest warrant, you could be

20  jailed until trial, and you could be prosecuted for contempt of

21  court; and on top of any punishment or sentence you may receive

22  for the crimes you're charged with now, violating your

23  conditions of release, just breaking these rules, could

24  release -- could result in a prison term, a fine or both.

25        Something else you need to know is while you're out on

1    pretrial release, which is what this is, if you commit any

2    federal or state crime, you can face a much more severe

3    punishment than you would receive for committing the same crime

4    at any other time.  So the fact that you're on release just

5    puts you in a different category, and there's a separate

6    penalty for committing a crime while you're on release.  That's

7    its own offense, and that means on top of any term, any prison

8    term or any punishment you might receive for that crime,

9    whatever you did on release, that's going to be on top of,

10   consecutive to, any other sentence you might receive.

11            You also need to know that it is a crime to try to

12   bribe, influence, threaten, intimidate or retaliate against any

13   witness, victim, informant or anyone else who may have

14   information about this case.  And this case, given that we're

15   talking about a history of threats, this is particularly

16   important that again, whatever may have felt like normal in

17   whatever parts of the social media universe you inhabit, any

18   threats to somebody who may be a victim or a witness or an

19   informant is a crime.

20            It's also a crime to try to obstruct justice or to

21   threaten, intimidate, injure, try to influence any juror or any

22   court officer, and that includes any probation officer.  And

23   again, any prison terms for threats or obstructions is going to

24   be on top of any other sentence you might receive.

25            I also need to tell you about a separate offense.

1    It's sometimes called bail jumping.  That's -- I don't know

2    whether -- do people even use that term any more, because we

3    don't really use bail in the same way we used to.  But you're

4    going to be ordered to appear in the future for court hearings.

5    If you fail to appear, if you knowingly fail to appear as

6    required by your conditions of release, or if ultimately you're

7    sentenced to serve a sentence in a prison or other facility, if

8    you fail to surrender and appear, that's a separate criminal

9    offense, and again those -- any sentence you would receive for

10   that would be on top of any other sentence you might receive

11   for any other offense, and punishments can include a prison

12   term of up to ten years in prison.

13          In addition, if you fail to appear any bond that's

14   posted -- I don't he think we're talking about any cash bond

15   here, but would be forfeited.

16          As I said, we're making your mother a third-party

17   custodian here, which means you would be putting her in

18   jeopardy as well if you fail to follow any of these rules.  So

19   you're going to get a written statement of these rules.  There

20   are a lot of them.  This is, I'm sure, something completely new

21   to you in your life, but this is how we are arranging to not

22   hold you in the cell waiting for trial, and that's what we're

23   looking to do.

24          Mr. McNeil has worked very hard to try and balance.

25   He has an absolute responsibility to protect the public, and it

1    is in part a measure of his humanity and decency that he is

2    also thinking about you as a condition -- as a circumstance as

3    well, that we're trying to take into account here, but the

4    effect of all that is that we've put together a set of

5    conditions that we think can protect the public and give you an

6    opportunity to move forward constructively to get a job and to

7    keep contributing in your household and helping with your

8    sister and your mother during a terrible time in your

9    household.  So we're trying to make that work, but there's a

10   lot of rules that come with it, and you have to follow every

11   single one of them.  That's just how it works.

12             Mr. McNeil, anything further we need here?

13             MR. McNEIL:  I think the Court needs to inquire of the

14   mother to make sure she's willing --

15             THE COURT:  Yes.

16             MR. McNEIL:  -- to be a third-party custodian.

17             THE COURT:  Yes, that was my intention.

18             MS. GANT:  Does the Court want her to stand -- is here

19   okay?

20             THE COURT:  Yes, please.

21             MS. GANT:  Okay.

22             THE COURT:  Just move the microphone close enough that

23   we can hear.

24             MS. GANT:  Okay.

25             THE COURT:  I'm sorry.  Your name?

1          MS. DIAZ:  Ironelis Diaz.

2          THE COURT:  Okay.  And you are Ms. Lara's mother?

3          MS. DIAZ:  Yes.

4          THE COURT:  Okay.  And are you prepared to be

5    responsible for making sure that she abides by the conditions

6    and rules?  Have you heard all the conditions and rules I just

7    walked through?

8          MS. DIAZ:  Yes.

9          THE COURT:  There's a lot of them.

10         MS. DIAZ:  Uh-huh.

11         THE COURT:  Okay.  And it's going to require you to

12   make sure that all of the social media apps are taken off any

13   devices that she's using.

14         MS. DIAZ:  Yes.

15         THE COURT:  And it's going to require you to make sure

16   she's not making any kind of threats or otherwise acting out

17   during this time; do you understand that?

18         MS. DIAZ:  I understand, yes.

19         THE COURT:  Okay.  And it's going to require that you

20   make sure she's -- unless she's somewhere where Probation

21   allows her to be and where she has been given permission ahead

22   of time to seek work or to go to work, go to therapy, or go for

23   worship she has to be at home.

24         MS. DIAZ:  Okay.  Yes.

25         THE COURT:  Are you prepared to undertake the

1   obligation to make sure that happens?

2           MS. DIAZ:  Yes.

3           THE COURT:  Okay.  Do we need a separate undertake --

4   written undertaking on this?  I've actually never done the

5   paperwork on that.

6           PROBATION OFFICER PAIVA:  I think, yes.  I think there

7   is a third-party custodian agreement.

8           THE COURT:  I think so.

9           THE CLERK:  She will have to sign --

10          THE COURT:  Oh, I see it.

11          PROBATION OFFICER PAIVA:  Oh, okay.

12          THE COURT:  The signature is on the form itself.

13  Okay.  All right.  Thank you, Ms. Dumoulin.  I'm -- Ms.

14  Dumoulin is the one who actually does the hard work of getting

15  the form filled out and completed here.  So -- all right.

16          Anything else, Mr. McNeil?

17          MR. McNEIL:  I don't think so.  It was a little bit

18  hard to follow all the conditions.  With regard to social

19  media, it's not just deleting the social media apps, but it's

20  not -- no use of social media --

21          THE COURT:  Right, yes.

22          MR. McNEIL:  -- apps in part because you can use

23  social media on a desktop as well.

24          THE COURT:  Yes.  Let -- let me repeat that to make

25  sure that is the condition.  While removal of the apps is just

1    part of trying to take away the triggers and the temptation,

2    the -- the condition is at this time no use of any social

3    media.  The only forms of communication that you're permitted

4    in terms of transmission now, you can attend classes, you can

5    do schoolwork, but you may not participate in chat rooms, use

6    any social media apps or use the web to engage with social

7    media, whether -- and I don't care which name or which -- there

8    are more social media outlets now than I can keep track of, but

9    I do include WhatsApp among those things, even though it's

10    often used simply as a texting device.  So no WhatsApp, no

11    Insta, no...

12        MS. GANT:  There's no need to go through the list.

13    We'll be conservative.

14        THE COURT:  Yeah, I don't think I can, but it's in no

15    social media.

16        THE DEFENDANT:  Okay.

17        THE COURT:  You're going to be communicating either by

18    one-on-one text or by telephone, that's it.

19        THE DEFENDANT:  Okay.

20        THE COURT:  Okay.

21        MR. McNEIL:  Just -- I'm just wondering, does the

22    order include all these whatever 13 terms that are in the

23    Pretrial Services report?

24        THE COURT:  Yes.

25        MR. McNEIL:  I mean, I'm assuming it does, but I just

1    want to make sure --

2              THE COURT:  Yes.

3              MR. McNEIL:  -- before we wrap up that they're all in

4    there.

5              THE COURT:  Yes, they should be.  I think they are

6    already -- Ms. Dumoulin, they're already written out in the

7    written order just so that there's no losing track of -- it's a

8    lot to keep track of, and we want to make sure everybody's on

9    the same page.

10             Ms. Gant, is there anything further that you need from

11   my end?

12             MS. GANT:  I don't think there's anything further, as

13   long as the order for the psychiatric evaluation was narrowed

14   as we discussed.  I have nothing to add.  And we're prepared to

15   go downstairs to meet with Probation.

16             THE COURT:  Okay.  So -- so, yeah, there will be two

17   different conditions.  So they're already written separately.

18   One is participate in mental health treatment program as

19   directed.  That's going to include the ongoing therapy.  And

20   the second is participate in the psychiatric evaluation and

21   comply with all recommendations, sign any releases of

22   information authorizing U.S. Probation to verify participation

23   and evaluation.

24             And I think I would add as a further condition that

25   that evaluation or to arrange that such portion of that

1    evaluation as bears on the defendant's risk to the community or

2    to herself be made available to Pretrial Services, the Court,

3    and the prosecution.

4            MS. GANT:  That -- that would be great language.

5    Thank you.

6            THE COURT:  Okay.  All right.  I think that --

7    Ms. Dumoulin, do you have (indiscernible) -- to make sure that

8    makes its way into the things that the psychological evaluation

9    requirement includes the -- I'm making sure that it includes

10   specifically that the defendant shall arrange that a portion of

11   that evaluation include a report that can be made available to

12   the Court, Probation, and the government for purposes of

13   assessing the risk that the defendant may pose either to

14   herself or to the community.

15           MR. McNEIL:  Well, I don't suggest we change any of

16   those terms.  I think it goes without saying that because we

17   would rely on that report, to change her terms or reduce her

18   terms that it may be worthwhile having some discussion about

19   who is it that's going to do that report.

20           THE COURT:  I'm going to leave that to -- I think it's

21   mostly a credential issue; in other words, if Ms. Gant has

22   someone in mind, it would doubtless be wise for her to discuss

23   with you ahead of time who that is and what she expects,

24   because if the purpose is for the parties to come to court when

25   we meet next on -- is it March 8th -- to be in a position to

1    say, okay, we are closer to having information that we all

2    think is useful and reliable.  And clearly if -- if the

3    selection of effort -- expert or the method is such that the

4    government doesn't think it's useful and reliable, we will not

5    have made much progress from where we are right now.  So I'm

6    going to leave that to the parties to discuss and figure out

7    how to satisfy yourself on it, because I don't think I can hand

8    down an order that magically fixes that.

9          MR. McNEIL:  Your Honor, I wasn't suggesting that -- I

10    was just suggesting --

11          THE COURT:  Counsel on both sides strike me as having

12    good judgment and certainly, you know, a strong grasp of what's

13    at stake here.

14          Okay.  Ms. Gant, anything further?

15          MS. GANT:  I don't think so, your Honor.  Thank you.

16          THE COURT:  All right.  So we're going to stand in

17    recess, but Ms. Diaz and Ms. Lara and Ms. Gant will need to

18    remain here to work with Ms. Dumoulin in getting the conditions

19    signed up.

20          And then is Ms. Lara to report to meet with Pretrial

21    Services afterwards?

22          PROBATION OFFICER PAIVA:  Yes, she is.

23          THE COURT:  Okay.  All right.  So we're going to have

24    you for most of the afternoon here by the time we're done.

25          MS. GANT:  Thank you, your Honor.

1          THE COURT:  Thank you.

2          THE CLERK:  Thank you.  We are now in recess.

3          All rise.

4          (At 1:33:55 p.m., the recording ended.)

1               CERTIFICATE OF OFFICIAL REPORTER

2

3          I, Marianne Kusa-Ryll, Registered Diplomate

4    Reporter and Certified Realtime Reporter, in and for the United

5    States District Court for the District of Massachusetts, do

6    hereby certify that the foregoing transcript is a true and

7    accurate transcription prepared to the best of my skill,

8    knowledge, and ability from the official audio-recorded

9    proceedings in the above-entitled matter.

10

11

12      /s/ Marianne Kusa-Ryll                    2-4-2023

13      Marianne Kusa-Ryll, RDR, CRR                Date

14      Official Court Reporter

15

16

17

18

19

20

21

22

23

24

25